779 F.2d 992
 39 Fair Empl.Prac.Cas. 1017,
39 Empl. Prac. Dec. P 35,870, 54 USLW 2346
 Robert M. BERGER, Appellant,
and
Ray Franklin Barhight, Jr., Plaintiff,
v.
Frank J. BATTAGLIA, Individually and as Police Commissioner,
City of Baltimore and Baltimore City Police
Department, Appellees.
 No. 84-1440.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 9, 1985.
Decided Dec. 20, 1985.
 
 Barbara Mello, American Civil Liberties Union of Maryland, Baltimore, Md., for appellant.
 Justin J. King (Benjamin L. Brown, City Sol., Ambrose T. Hartman, Deputy Sol., Millard S. Rubenstein, Asst. Sol., Baltimore, Md., for appellees.
 Before WINTER, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 The issue is whether, consistently with the first amendment, the Baltimore Police Department could condition the continued employment of one of its police officers upon his cessation of off-duty public entertainment performances in blackface that members of Baltimore's black community found offensive. In this action by the police officer against the Department under 42 U.S.C. Sec. 1983, the district court, applying the balancing test prescribed in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), as elaborated in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), denied the claim, striking the constitutional balance in favor of the Department. Because, applying the same test, we strike the balance differently, we reverse and remand for further proceedings.
 
 
 2
 * The essential facts, as agreed to by the parties on appeal, and as basically reflected in the district court's findings of fact, are as follows.
 
 
 3
 Before the events here in issue resulted in this lawsuit, plaintiff Robert M. Berger had been an officer in the Baltimore Police Department since December 1972. During much of his tenure with the Department he had also performed music during his off-duty hours, first at Old Shantytown, a tavern owned by his brother in the Highlandtown section of Baltimore, and later at other bars, clubs and taverns, mostly in the Baltimore area. His musical performance, in which he sings and plays various instruments, is built primarily around popular music of the first half of the twentieth century--music in which he has been interested since childhood, when his family and neighbors gathered at his parents' house for weekly sing-alongs. For the past several years the most prominent feature of Berger's act had been an impersonation of the late singer Al Jolson, which he performed in blackface makeup and a black wig after the manner of the originator. He typically performed to family audiences numbering between 100 to 200 people.
 
 
 4
 In none of his performances did Berger identify himself as a police officer; offer any comment on Department policies or operations; make any reference to any other member of the Department; nor claim to be speaking for or in any way representing the Department. Although various media, in commenting on or describing his performance, referred to him as "the singing cop," that designation was, so far as the record reveals, theirs, not Berger's.
 
 
 5
 In his performances Berger's only purpose was to provide entertainment for willing listeners. He urged no conduct, incited no activity, made no derogatory or inflammatory remarks, advocated no lawlessness and sought no confrontation.
 
 
 6
 From at least 1979 Berger's superiors within the Police Department were aware of his musical activities, including the Al Jolson impersonation. On several occasions Deputy Commissioner William F. Rochford had introduced him to visitors as "the Department's Al Jolson." A member of the command staff (defined as officers of the rank of captain and above)--one Colonel Avara--made a practice of asking him to sing "Mammy" when he encountered him on the street, in full uniform. Numerous members of the command staff, including the deputy commissioner, had seen him perform in clubs and taverns. Prior to 1982, no member of the Department had complained to him about the content of his act or suggested that he not perform it in blackface.
 
 
 7
 During this period, police department regulations permitted officers to engage in secondary employment in their off-duty hours, provided they obtained specific permission in advance. In December 1981 Berger was disciplined for having performed for pay without having sought or received the necessary permission. From that time until February 1982 he had continued to perform, but had received no money.
 
 
 8
 Early in 1982 Berger entered into an agreement with the management of the Baltimore Hilton Hotel to perform his act, including the Al Jolson imitation, in the B-100 Lounge, a nightclub located on the ground floor of the hotel. By the terms of the agreement Berger and a band which he was to provide were to be given a two-week tryout for three nights per week, beginning February 7, 1982. If that tryout were successful, the engagement was to be extended an additional 10 weeks. Because of his earlier violation of Department regulations respecting off-duty employment, Berger was not to receive money for his performance, although the members of the band were to be paid.
 
 
 9
 Prior to the scheduled opening date, the hotel advertised Berger's performance in the Baltimore newspapers. The advertisements were illustrated by a photograph of Berger in his blackface makeup. They did not identify him as a police officer.
 
 
 10
 The sight of these advertisements offended many black citizens of Baltimore, especially members of the National Association for the Advancement of Colored People (N.A.A.C.P.), some of whose members resolved to express their disapproval of a white entertainer's appearing in blackface and, if possible, to prevent the performance from going on. One of these was Dr. Emmett C. Burns, regional director of the N.A.A.C.P. for the geographic area which includes Baltimore and the State of Maryland. At this time, Dr. Burns did not know that Berger was a city police officer. Burns' objection at this time was based simply upon the fact that, as he testified, he and others whom he represents considered any appearance by a white in blackface makeup to be "absolutely horrendous--a throwback to the days of the minstrels, when blacks were portrayed as clowns, simpletons, buffoons, apes and other animals of the lower kingdom." In this, as he also testified, he made no exception for portrayals of black persons by white persons in art forms such as Othello.
 
 
 11
 On February 7, 1982, when Berger arrived at the Hilton, he was met by two men, Dr. Wallace Gatewood and Adam Van Landingham, who introduced themselves as representatives of the N.A.A.C.P. and demanded that he not perform his Jolson imitation because it was insulting to blacks. After discussion with these two, Berger agreed to do his entire show, including the Jolson portion, without makeup in order to demonstrate the lack of racial content in the act. Following the performance he received a standing ovation from the entire audience of some 150 people, including Gatewood and Van Landingham. Both of these two expressed approval of plaintiff's act, and Van Landingham, a part-time talent agent, gave him a business card and suggested that Berger call him to discuss possible future bookings.
 
 
 12
 On February 8 Berger performed in blackface without incident, again receiving a standing ovation from a packed house. Gatewood and Van Landingham, however, had by now reversed their stand of the previous evening and objected to the act's being done in blackface.
 
 
 13
 On February 9 Dr. Burns and approximately 30 persons associated with the N.A.A.C.P. set up a picket line outside the Hilton to protest the continuation of the engagement. They were joined by Bobby Cheeks and eight members of the Baltimore Welfare Rights Organization, of which Cheeks was executive director. The pickets marched in a circle on the sidewalk, carrying placards stating their objections to the show.
 
 
 14
 As the time for Berger's performance drew near, some of the pickets or demonstrators entered the hotel and the nightclub itself, with the intention of preventing the performance. In keeping with the policy of the N.A.A.C.P., it was not then the intention of Dr. Burns and his group to resort to violence or other unlawful activity to achieve their goal. On the other hand, Mr. Cheeks and his followers were then prepared, according to Cheeks' testimony, to go onto the stage and stop the show, by physical force if necessary.
 
 
 15
 Whatever the actual intentions of these two groups, Sgt. William D. Lawson of the Department's Community Relations Section, who was on duty at the Hilton that evening, had heard numerous rumors to the effect that blacks in the audience intended to storm the stage to prevent the show from going on, and that certain whites who wished to see the performance were prepared in that event to counter-attack. Although he never heard anyone directly threaten anyone else, Sgt. Lawson feared possible violence if these rumors materialized into fact. He therefore requested additional police assistance. In response to his request, some two dozen officers from the Tactical Squad and the Central District, plus wagons, were dispatched to the Hilton, under orders to remain on standby, out of sight and away from the Fayette Street (main) entrance to the Hotel unless they were needed for crowd control.
 
 
 16
 This redeployment of forces left eight posts in the city's Central District unmanned (but covered by personnel from adjacent manned posts, which "doubled up" their coverage) for approximately two hours. The police manpower available on the scene was, however, more than adequate to deal with any situation that might develop. Lawson's and the Department's primary concern on February 9 was that if the demonstrators were unsuccessful in stopping the performance on that evening, their numbers would increase geometrically on the evenings of subsequent scheduled performances. Ultimately, confrontation was averted when the Hilton management cancelled the show.
 
 
 17
 Following the events of February 9, the police department received a number of complaints from black citizens, including Dr. Burns and Mrs. Enolia McMillan, executive director of the Baltimore branch of the N.A.A.C.P., objecting vehemently to a police officer's being permitted, as they saw it, to offer a public insult to members of their race. These complaints were a matter of serious concern to the Department, which had been engaged since the mid-to late-1960's in what Deputy Commissioner Bishop L. Robinson described as a "comprehensive, integrated community approach" to improving its previously strained relations with the black citizens of Baltimore. The Department feared that its community relations efforts would be undermined by widespread outrage over Berger's performances. Consequently, Commissioner Frank J. Battaglia referred the matter to Deputy Commissioner Rochford for appropriate action.
 
 
 18
 At this time, Berger had been on light-duty status, assigned to building maintenance, since early 1979, when he had been injured in a line-of-duty automobile accident. On February 12, 1982, Commissioner Rochford ordered him to cease all public performances, in any capacity, while on light-duty status.
 
 
 19
 On receiving Commissioner Rochford's order, Berger consulted an attorney, who advised him that, in his opinion, the order was unconstitutional and who wrote to Commissioner Rochford advising him that Berger's best medical interests were not jeopardized by his off-duty activities.
 
 
 20
 On February 19 Berger was summoned to the Department's Medical Section, where he was called to see the attending physician ahead of 16 other persons who were in line before him and, without medical examination or consultation more recent than December 1981, was ordered to return to full duty.
 
 
 21
 On February 19 Berger was ordered by his commanding officer, Captain Walter T. Jasper, to cease appearing in public wearing blackface on pain of being found in violation of the Department's rule prohibiting activity on the part of a member of the Department "that tends to reflect discredit upon himself or upon the Department." Captain Jasper issued this order on instructions from Commissioner Battaglia.
 
 
 22
 On February 23, Berger applied, on a form provided by the Department, for permission to receive pay for his performances. Although his sergeant and his lieutenant approved his application, Captain Jasper and Deputy Commissioner Robinson denied it. Sometime later, following an altercation with a fellow officer, Berger was stripped of his police powers and assigned to compiling crime statistics.
 
 
 23
 Following the events at the Hilton Hotel, Berger continued to perform in blackface, without incident or complaint, at various locations in Baltimore City and Baltimore County. The Department has conceded that as of the time of trial, there had been no significant impairment of the Department's relations with the black community. Neither had there been any disruption of the Department's internal harmony and operations resulting from any of Berger's performances in blackface.
 
 
 24
 Berger brought this action, under 42 U.S.C. Sec. 1983, against the Department and Battaglia, its Commissioner, claiming deprivation under color of state law, of rights secured under the first and fourteenth amendments. Specifically, he alleged violation of free speech rights by the order requiring him to cease public performances in blackface, and the denial of his request for permission to perform for compensation while off-duty in reprisal for his past performances. A co-plaintiff, Barhight, joined the action, alleging that the same Departmental acts deprived him of his rights under the first and fourteenth amendments to see and hear the prohibited performances.
 
 
 25
 The case was tried to the court. In a careful and comprehensive memorandum opinion, the district court analyzed and denied the plaintiffs' claims and directed entry of judgment for defendants. In summary, the court, applying the constitutional balancing test prescribed in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), first determined that Berger's speech was "upon a matter of public concern" and therefore was entitled to first amendment protection unless, on balance, the Department's interests as a public employer in avoiding the threat posed by the speech to the efficient performance of its duties outweighed the first amendment values involved in the particular speech. In the balancing calculus, the court ascribed less than core first amendment value to the merely artistic as distinguished from political content of Berger's public entertainment; found no resulting internal disruption of Departmental operations; but ascribed overpowering weight to the Department's interests in avoiding future diversions of its resources to cope with threatened disruptions by offended members of Baltimore's black community of comparable Berger performances, and in maintaining the Department's hard-earned good relations with that formerly hostile black community. In the course of that analysis, the court rejected any notion that the Hilton performance and its associated threat to public order would alone have justified the Department's cessation order, since that incident occurred at a time when Berger was not even known by the demonstrators to be a public employee and would presumably have caused the same diversion of resources had he not been. The court therefore considered only those Departmental interests concerned with the threat of future disruptions of order and harmonious relationships in striking the constitutional balance in favor of the Department as public employer.
 
 
 26
 This appeal followed.
 
 II
 
 27
 As the district court observed, application of the Pickering "balancing test" to the facts of this case presents some threshold conceptual problems. This particular controversy does not fit too neatly within the paradigmatic factual pattern out of which the "Pickering test" has developed.
 
 
 28
 In that pattern the employee speech has invariably involved some form of criticism or questioning of the public employer's policy,[1] or of its specific actions,[2] or of supervisory personnel[3] expressed either privately to the employer[4] or publicly.[5] From the public employer's perspective in this pattern, the threat to public employer interests posed by such speech has as invariably been seen as the direct disruption of employment relationships, hence of internal efficiency, naturally flowing from employee insubordination or disloyalty.
 
 
 29
 The Pickering "balancing test" has therefore been developed in a context where the conflicting interests being assessed were, on one hand, those of a citizen in being free to remain openly critical of government notwithstanding it was his employer and, on the other, those of his public employer in being able by appropriate disciplinary action to avoid disruption of its internal operations. While no one could contend that application of the test even in that paradigmatic fact pattern has always been easy,[6] that pattern does at least pose the clash of public employee and public employer interests in employee speech rights in its most direct and easily identified form: the employee's right to criticize or disagree with governmental operations versus the governmental interest in avoiding the internally disruptive effect of the very criticism or disagreement.
 
 
 30
 Here, at odds with the paradigmatic Pickering pattern, the employee speech was not criticism of or disagreement with governmental operations, and the governmental interest assertedly threatened by the speech was not internal employment relationships and operations. Instead the speech here was a form of artistic expression wholly unrelated in content to the public employer or its operations, and the threat it assertedly posed to employer interests was not internal disruption by the speech itself, but external disruption by third persons reacting to the speech.
 
 
 31
 While the Pickering test therefore emerged from a general fact pattern not perfectly replicated by that presented here, its underlying constitutional principles are nevertheless perfectly apposite and necessarily controlling here as well. To those principles we therefore turn in order to adapt and apply them to the conflicting interests involved in this controversy.
 
 III
 
 32
 The basic principle, representing a fairly recent revision of the "unchallenged dogma" of most of this century, is that "a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Connick, 461 U.S. at 142, 143, 103 S.Ct. at 1687, 1688. Not all public employee speech is protected, however, against this particular form of state action. Only that speech which both lies within the general protection of the first amendment (e.g., is not obscene) and is "upon a matter of public concern" may be entitled to that particular protection. Public employee speech not on matters of "public concern" simply enjoys no protection against public employer disciplinary action, though it may be protected against other forms of state action. Id. at 147, 103 S.Ct. at 1690. As to such speech, the state's interest as public employer in managing its personnel and internal operations is sufficiently weighty that the public employee's first amendment rights in the speech are no greater than would be those of a private employee. Ibid.
 
 
 33
 Even speech on matters of public concern does not enjoy absolute protection against public employer disciplinary action. The public employer's "interest in the effective and efficient fulfillment of its responsibilities to the public" may be so threatened by the speech that disciplinary action, including discharge, may be justified. Connick, 461 U.S. 149-54, 103 S.Ct. at 1691-93. Whether disciplinary action directed at public employee speech on matters of public concern is justified in a particular case requires "particularized balancing" to reach the "most appropriate possible balance of the competing interests." Id. at 150, 103 S.Ct. at 1692.
 
 
 34
 The issues of whether particular employee speech is upon a matter of "public concern" and, if so, whether, on balance its value outweighs any competing interest of the public employer in avoiding disruptive effects of the speech, are both questions of law, not fact. As such they must be resolved by courts exercising independent judgment in application of first amendment principles. Id. at 148 n. 7, 150 n. 10, 103 S.Ct. at 1690 n. 7, 1692 n. 10. For our immediate purposes, this means that we freely review the district court's resolution of those constitutional issues here, applying our own independent judgment to the established historical facts which, as indicated, are not in any significant dispute on this appeal.
 
 A.
 
 35
 The first question is whether Berger's "speech" was, within contemplation of the Pickering test, upon a matter of "public concern," hence subject to qualified first amendment protection as against any public employer disciplinary action. On this, the district court held that the speech, as a form of artistic expression presented to obviously interested public audiences, was, for the purpose at hand, "on a matter of public concern." The defendants do not on appeal challenge that basic determination, and we agree with it. But because, as the district court observed, the speech here--entertainment--is not the type directly considered in the paradigmatic Pickering pattern, we elucidate somewhat upon the basis of our agreement.
 
 
 36
 Pickering, its antecedents, and its progeny--particularly Connick --make it plain that the "public concern" or "community interest" inquiry is better designed--and more concerned--to identify a narrow spectrum of employee speech that is not entitled even to qualified protection than it is to set outer limits on all that is. The principle that emerges is that all public employee speech that by content is within the general protection of the first amendment is entitled to at least qualified protection against public employer chilling action except that which, realistically viewed, is of purely "personal concern" to the employee--most typically, a private personnel grievance. See Connick, 461 U.S. at 148-49, 103 S.Ct. at 1690-91 ("upset with the status quo"; "dispute over [employee's] transfer"; "controversy with" employer; "employee's dissatisfaction"; "complaints over internal office affairs" used as descriptives of speech on matters found not of public concern). That is to say, the purpose of the inquiry is to prevent turning every public employee expression of private grievance into a constitutional case, id. at 149, 103 S.Ct. at 1691, while at the same time enforcing the new dispensation, dating back at least to Keyishian v. Board of Regents, 385 U.S. 589, 605-06, 87 S.Ct. 675, 684-85, 17 L.Ed.2d 629 (1967), that by accepting public employment a citizen does not absolutely forfeit his first amendment right to express himself freely upon "any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146, 103 S.Ct. at 1689. The focus is therefore upon whether the "public" or the "community" is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a "private" matter between employer and employee.
 
 
 37
 This of course requires subtle judgment. For under this general principle, an employee's expression of grievance about an employer's personnel actions, though obviously related at bottom to the conduct of government operations, may nevertheless be viewed only as a private grievance. See id. at 148-49, 103 S.Ct. at 1690-91; but see id. at 163-64, 103 S.Ct. at 1698-99 (Brennan, J., dissenting) (employee expressions about internal operations of governmental office are necessarily on matters of "public concern"). On the other hand, employee criticisms of employer policy made privately to the public employer may nevertheless be on a matter of "public concern" where the content and the context reveal that the expression is not merely that of a private grievance. See Givhan, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (privately criticizing allegedly racially discriminatory policies of public employer).
 
 
 38
 Applying this test, Berger's performances clearly were not purely personal expressions of no concern to the community. Rather, they constituted speech upon a matter of obvious public interest to those considerable segments of the community who willingly attended and sometimes paid to see and hear them. That the content was sheer entertainment--presumably neutral as to any political or even social views--does not of course take them outside first amendment protection. Stanley v. Georgia, 394 U.S. 557, 566, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969).
 
 
 39
 The speech at issue was therefore entitled to protection against the challenged actions of the defendants unless those actions could be justified under the Pickering balancing test. To that we now turn.
 
 B.
 
 40
 As was proper, the district court first assessed the value, from the first amendment perspective, of Berger's "speech." The court found the artistic expression involved to be of less value than that found in speech on political matters and public affairs, the "core" values protected by the first amendment.
 
 
 41
 We do not disagree with the general assessment that entertainment ranks lower on the scale of first amendment values than does pure political debate. But we disagree with the district court's further assessment that in the Pickering calculus, Berger's artistic expression should not be viewed "as particularly important, or worthy of a great deal of protection."
 
 
 42
 We think, instead, that in assessing its value for Pickering balancing purposes, this type of off-duty public employee speech has to be accorded the same weight in absolute terms that would be accorded comparable artistic expression by citizens who do not work for the state. And that value, traditionally, has been accorded a great deal of weight, certainly not far below the value accorded political and social commentary and debate. See, e.g., Schad v. Borough of Mount Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); Doran v. Salem Inn, Inc., 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).
 
 
 43
 We do not, as did the district court, read the Pickering, Givhan and Connick Courts' emphasis on the importance attached to speech on matters involving public affairs and the operations of government as implying that employee speech on other matters lying within the first amendment's general protection should be accorded little weight in the public employee speech balancing process. That emphasis in those cases we think simply reflected the fact that that was the type of speech involved in each, and that in content such speech does indeed embody core first amendment values.
 
 
 44
 But the basic principle is that except as qualified by the special exigencies of the employment relationship, public employees retain the full panoply of first amendment rights enjoyed by all citizens. One of the fundamental rights secured by the amendment is that of free, uncensored artistic expression--even on matters trivial, vulgar, or profane. See Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948); Edwards v. Habib, 397 F.2d 687 (D.C.Cir.1968); see also Connick v. Myers, 461 U.S. at 157 n. 1, 103 S.Ct. at 1695 n. 1 (Brennan, J., dissenting).
 
 
 45
 We therefore accord Berger's speech the value, in absolute terms, that it would be accorded in any citizen, undiminished by the fact here of his state employment. See id. at 147, 103 S.Ct. at 1690. ("Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government"); see also id. at 157, 103 S.Ct. at 1695 (Brennan, J., dissenting). In the balancing process, the only significance that the particular content of speech has is in the degree to which it tends to jeopardize the public employer's capability to perform its duties effectively and efficiently. See id. at 152, 103 S.Ct. at 1693 ("clear potential for undermining office relations" found in specific content of employee speech).
 
 
 46
 As indicated, the district court then found Berger's speech, which it had assessed as not "particularly important" in first amendment terms, outweighed in the balance by the Police Department's reasonably perceived interests in avoiding future disruptions both of its resources and of its harmonious relationships with the black community. With all respect to the district court's careful assessment, and with considerable sympathy for the beleaguered police department's dilemma, we simply do not agree with this final striking of the balance.
 
 
 47
 It is at least arguable from Pickering, its antecedents, and its progeny, that the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships. Certainly this could be deduced by looking at the specific results as well as the critical language of the principal decisions applying the post-Keyishian dispensation in public employee-first amendment cases. See Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) (discharge for pure patronage reasons, with no showing of internal disruption by virtue of political association itself, impermissible); Pickering, 391 U.S. 563, 570, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (discharge impermissible where "no question of maintaining either discipline ... or harmony" involved and no showing of need for "personal loyalty and confidence" in employment relationship); Givhan, 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (discharge impermissible unless shown that private confrontation with immediate superior threatened "institutional efficiency"); Connick, 461 U.S. 138, 151, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708 (discharge permissible where public employer reasonably viewed employee speech as causing a "mini-insurrection").
 
 
 48
 Here there is no suggestion of the kind of internal disruption which the Court in the decisions above noted may be thought to have considered the only sort justifying disciplinary action by public employers. Indeed, the district court expressly found, and the defendants concede, that no such disruption was caused by Berger's speech.
 
 
 49
 But we need not decide whether only internal disruption can ever suffice as a justification for public employer disciplinary action directed at employee speech. Assuming that under some circumstances disruption by employee speech of a public employer's external operations and important external relationships[7] might justify disciplinary action, we hold that those circumstances cannot in faithfulness to first amendment principles be found here.
 
 
 50
 Here not only was the perceived threat of disruption only to external operations and relationships, it was caused not by the speech itself but by threatened reaction to it by offended segments of the public. Short of direct incitements to violence by the very content of public employee speech (in which case the speech presumably would not be within general first amendment protection), we think this sort of threatened disruption by others reacting to public employee speech simply may not be allowed to serve as justification for public employer disciplinary action directed at that speech.
 
 
 51
 Historically, one of the most persistent and insidious threats to first amendment rights has been that posed by the "heckler's veto," imposed by the successful importuning of government to curtail "offensive" speech at peril of suffering disruptions of public order. See Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). Government's instinctive and understandable impulse to buy its peace--to avoid all risks of public disorder by chilling speech assertedly or demonstrably offensive to some elements of the public--is a recurring theme in first amendment litigation. See, e.g., Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974); Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); Rowan v. Post Office Department, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970); Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); Collin v. Smith, 578 F.2d 1197 (7th Cir.1978). Though this "veto" has probably been most frequently exercised through legislation responsive to majority sensibilities, the same assault on first amendment values of course occurs when, as here, it is exercised by executive action responsive to the sensibilities of a minority.
 
 
 52
 As indicated, the special dilemma presented for the Police Department here can only excite judicial sympathy. One may well feel--as undoubtedly did the Department--that a little forbearance on the part of Berger, given the special circumstances of his public employment and the hard-earned and presumably still tenuous trust of the black community, would be in order. One may also wonder--as undoubtedly did the Department--whether the outrage being represented to it as that of the "black community" was truly that widely shared and whether a better and more effective response might have been continued public non-violent demonstrations of contempt and outrage by those sufficiently offended.
 
 
 53
 Nevertheless, however real the dilemma, we think and hold that the Department--after all an agency of the state charged with enforcing the first amendment as well as with maintaining public order--could not respond as it did consistently with the first amendment, once Berger had declined to forbear and stood on his constitutional rights. Those rights of course exist in the unforbearing as well as the forbearing and have in fact undoubtedly been hammered out largely in behalf of the temperamentally unforbearing who are fortunate enough to live in a society that protects their right immediately to "stand on their rights."
 
 
 54
 An appropriate Department response, perhaps the only one, wholly consistent with the first amendment, would have been instead to say to those offended by Berger's speech that their right to protest that speech by all peaceable means would be as stringently safeguarded by the Department as would be Berger's right to engage in it. We have no illusions that this would have been a satisfactory response, nor that it may not have led to some of the very disruption of operations and resources that the Department feared. But it would not only have been the most sound response constitutionally, it would have been an eminently practical one for any of those offended by Berger's speech who were at least willing to consider the wider implications of the principle for which they at least implicitly contended: that offensive speech may properly be curbed by exerting this form of leverage upon public employers. But this is a device as readily seized upon by one group in society as another, and is one more readily available in most times to majority than to minority groups. There are of course many illustrations of this, but a particularly apt one for this purpose is that considered by the Fifth Circuit in Battle v. Mulholland, 439 F.2d 321 (5th Cir.1971). There a black police officer in a small Mississippi town had been discharged by the town officials because of the town fathers' concern, prompted by complaints, and probably justified, that his conduct would exacerbate an already tense racial situation in the town. Noting that this "type of restrictive response, based on theoretical reactions by others" to conduct protected by the first amendment had "long been condemned," the court held the discharge constitutionally impermissible. We think that the principle applied there is precisely that one applicable here, though figuratively, the shoe here is on the other foot.
 
 IV
 
 55
 In summary, we hold that Berger's conduct in performing public entertainment in blackface was constitutionally protected speech and that the defendants as public employers were not justified by any sufficiently weighty countervailing state interest in taking disciplinary action either punishing Berger for that conduct or chilling in any way his continuation of it. We therefore vacate the district court's judgment dismissing the claims of Berger and Barhight and remand for further proceedings consistent with this opinion.
 
 
 56
 In remanding, we make these observations about the proper scope and conduct of further proceedings.
 
 
 57
 As indicated, Berger actually alleged two specific violations of his constitutional rights: the order specifically and narrowly prohibiting his further public appearances in blackface and the later order denying him the right to perform at all for compensation.
 
 
 58
 Our decision necessarily determines that the order preventing future appearances in blackface was specifically violative of Berger's first amendment rights. There remains on this only the issue of the appropriate remedy for that violation.
 
 
 59
 As to the order denying Berger the right to perform for compensation, we think this must be reexamined by the district court in light of our decision. The district court expressed itself as being unclear as to whether Berger may have abandoned this particular claim of violation, but nevertheless addressed it. It was then disposed of in rather summary fashion. Although the Department had also advanced other reasons for the order, the court specifically found that the purpose of this order was to "stop future performances that might anger the black community." On this basis, the court upheld the validity of the order on the same basis it had upheld the "blackface" order: that Berger's conduct was not protected against appropriate disciplinary action, and that under the circumstances, this was appropriate disciplinary action, particularly in view of Berger's refusal to obey the "blackface" order.
 
 
 60
 Our decision necessarily determines that the Department could not constitutionally do this for the purpose alone of punishing or chilling Berger's protected conduct. But the district court's memorandum decision leaves us unclear as to whether it also specifically ruled out any of the other reasons advanced by the Department (e.g., excessive medical leave, history of performing at establishments serving alcohol) as independently valid reasons. If upon remand the district court considers that this is an open issue, it may permit the defendants to present a defense based upon the "but for" principle of Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). If, however, the court considers that it has already ruled against any such defense (a finding that we could not hold clearly erroneous on this record) the only issue remaining for resolution as to this particular claim is that of remedy.
 
 
 61
 As to the nature and extent of any monetary remedy to which Berger may be entitled in respect of either of the specific claims of violation, we of course express no opinion. He is obviously entitled to appropriate declaratory and injunctive relief conformable to this decision.
 
 
 62
 The district court did not allude separately to the basis of Barhight's claim that the Department's actions deprived him of first and fourteenth amendment rights to hear and see Berger's forbidden performances. Because that claim is obviously derivative of and dependent upon the existence of Berger's protected interest, we assume that Barhight's claim was found to have failed on the same basis that Berger's was rejected. So far as we can perceive, defendants have raised no independent defenses to Barhight's claim, which presumably is only for appropriate declaratory and injunctive relief.
 
 
 63
 REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
 
 
 
 [1]
 Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (policy respecting revenue proposals); Givhan v. Western Line Consolidated School District, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (allegedly racially discriminatory policies)
 
 
 [2]
 Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (transfer of claimant; application of political pressure to employees)
 
 
 [3]
 Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (questioning confidence in and reliability of specific supervisors)
 
 
 [4]
 Givhan v. Western Line Consolidated School District, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (in privately arranged meeting with supervisor)
 
 
 [5]
 Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (open letter to newspaper)
 
 
 [6]
 See, e.g., Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (5 to 4 decision as to whether particular speech was protected)
 
 
 [7]
 Cf., e.g., Waters v. Chaffin, 684 F.2d 833, 839 n. 12, 840 (11th Cir.1982) (possible disruption of external operations); Byrd v. Gain, 558 F.2d 553, 554 (9th Cir.1977) (same)