## Linda M. Pereira vs. Commissioner of Social Services & another.[1]

Suffolk. May 2, 2000. - August 9, 2000.

Present: Marshall, C.J., Abrams, Greaney, Ireland, Spina, & Cowin, JJ.

*Constitutional Law,* Freedom of speech and press. *Public Employment,* Termination. *Civil Rights,* Immunity of public official.

Discussion of cases considering the circumstances in which an employer may discipline an employee for the employee's exercise of a constitutionally protected right of free speech. [256-257]

A public employee's telling of an offensive racist "joke" at a political event was not speech on a matter of public concern and was not protected by the First Amendment to the Constitution of the United States [257-259]; however, this court concluded that the principles expressed in *Pickering* v. *Board of Educ.,* 391 U.S. 563 (1968), were apposite: in circumstances in which the public employee had engaged in expression unrelated to employment and away from the workplace, the employee's interest in making the statement was to be balanced against the interest of the public employer in promoting the efficiency of the public services it performs through its employees [260-262].

Where a public employee demonstrated a relatively insubstantial interest in making a "stupid," "racist," and "unthinking" statement at a political event unrelated to the workplace, and where the statement, which became public, undermined the goals of the public employer, the Department of Social Services, and objectively damaged the effectiveness and integrity of the agency in the community, the employee was properly subject to discipline by the employer. [262-264]

Civil action commenced in the Superior Court Department on September 9, 1996.

The case was heard by *Herman J. Smith, Jr.,* J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Mark P. Sutliff,* Assistant Attorney General, for the defendants.
*Eric S. Maxwell* for the plaintiff.

[1]Department of Social Services.

MARSHALL, C.J. We consider whether an investigator employed by the Department of Social Services (DSS or department) may be disciplined for making an offensive racist comment at a testimonial dinner for retiring members of a city council. We conclude that the decision taken by a public agency to discharge her must be upheld. We reverse an order of summary judgment in favor of the employee.

In September, 1996, Linda M. Pereira commenced this action against the department and its commissioner, in her official capacity and individually, alleging that she had been terminated from her position as a DSS social worker "solely as a consequence of her protected speech" in violation of her rights under the First Amendment to the United States Constitution and the Constitution of the Commonwealth of Massachusetts.[2] She brought this action pursuant to G. L. c. 30A (administrative procedure act), G. L. c. 231A (declaratory judgment), G. L. c. 249, § 5 (mandamus), and 42 U.S.C. § 1983 (1994) (Federal civil rights statute). She also alleged common-law violations for wrongful termination and infliction of emotional distress. Pereira sought declaratory and injunctive relief, as well as monetary damages from the commissioner individually.

The parties submitted cross motions for summary judgment, which, in October, 1998, a judge in the Superior Court allowed in part and denied in part. He held that Pereira's claims under G. L. c. 30A; G. L. c. 231A; and G. L. c. 249, § 5, were barred as untimely filed.[3] He allowed Pereira's motion for summary judgment on the issue of liability as to her civil rights claim against the commissioner in her individual capacity, concluding that she was not entitled to qualified immunity because the

[2]On appeal Pereira has not pursued her claim under the Massachusetts Constitution, and we do not address it. See *Lee* v. *Commissioner of Revenue*, 395 Mass. 527, 534 n.10 (1985), quoting *Atterberry* v. *Police Comm'r of Boston*, 392 Mass. 550, 555 (1984), cert. denied sub nom. *Atterberry* v. *Jordan*, 469 U.S. 1208 (1985) (where there is "no separate discussion of Massachusetts constitutional principles . . . we review the . . . claim solely on the basis of an alleged violation of Federal constitutional principles").

[3]The judge explained that, pursuant to the collective bargaining agreement between the department and Pereira, she had been afforded a hearing to determine whether there was just cause for her termination. Pereira failed to appeal from the decision adverse to her within the statutory period of thirty days. G. L. c. 30A, § 14. See note 4, *infra*. Pereira cannot circumvent the limitation period by framing her action as one for declaratory judgment. See *School Comm. of Franklin* v. *Commissioner of Educ.*, 395 Mass. 800, 807-808 (1985).

constitutional right of free speech, he said, was "clearly established," and a reasonable official "would have understood" that firing Pereira would violate her constitutional rights. He ordered a trial on the issue of damages against her. The judge also determined that Pereira was entitled to injunctive relief against the department on her civil rights claim and ordered the department to reinstate her nunc pro tunc with back pay.[4] The judge determined that Pereira's claim for intentional infliction of emotional distress raised issues of material fact that could not be disposed of on summary judgment.

Judgment on the cross motions entered on November 25, 1998. The commissioner, in her individual capacity, took an appeal from the denial of her qualified immunity on Pereira's claim for monetary damages.[5] In February, 1999, the department moved for entry of a separate and final judgment on the order granting Pereira's claim for equitable relief, which was allowed in March, 1999. Meanwhile, the department and the commissioner jointly moved to stay, pending appeal, the order requiring the department to reinstate Pereira to her former job, the trial on damages for Pereira's claim against the commissioner under 42 U.S.C. § 1983, and the trial on liability and damages on Pereira's claim for intentional infliction of emotional distress, all of which the judge allowed.[6]

---

[4]In the interim, the parties had commenced arbitration concerning Pereira's firing. A decision by the arbitrator was issued after the cross motions for summary judgment had been argued, but before the judge issued his memorandum and order. The arbitrator's decision was not part of the summary judgment record but was filed by the defendants in support of their motion to stay the judgment. The arbitrator ruled that Pereira's off-duty conduct had a "meaningful and substantial nexus" to her workplace and warranted some form of discipline. She determined that a one-year suspension, rather than discharge, was "sufficient" discipline "to instill in Ms. Pereira a commitment to never repeat the injurious type of statement that she made and to assure the community that the Department does not tolerate any form of racism." Pereira does not challenge, here, the severity of her discipline. She argues that she is immune from all discipline.

[5]Although the judge's order did not conclude Pereira's action at the trial level, his order denying the commissioner qualified immunity "is final" and "the question of the validity of the judge's order is ripe for consideration by this court." Breault v. Chairman of the Bd. of Fire Comm'rs of Springfield, 401 Mass. 26, 31 (1987), cert. denied sub nom. Forastiere v. Breault, 485 U.S. 906 (1988).

[6]In allowing the defendants' motion to stay the order pending appeal, the

The commissioner's appeal from the denial of her claim for qualified immunity and the department's appeal from the judge's order were consolidated in the Appeals Court. We transferred the case to this court on our own motion.

I

We summarize the facts as stipulated by the parties, supplemented where appropriate by facts appearing in the record that are not disputed. See *Community Nat'l Bank* v. *Dawes*, 369 Mass. 550, 553-554 (1976); Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). Pereira was employed by DSS for over twelve years, during which she had an "unblemished" record. At the time of her discharge, Pereira was a "protective investigator."[7] Her principal responsibilities required her to review reports of allegations of abuse and neglect of children, screen cases to determine whether the department should proceed with an investigation, and to investigate any abuse allegation within ten days, or within hours if the report indicated an emergency. In consultation with a supervisor, Pereira determined whether in any particular case the removal of a child from home was necessary. To those ends, her investigations involved significant contact with DSS clients, the community, and social service organizations, among others, as she interviewed and investigated those involved with and implicated in the abuse reports. For DSS to carry out its public mandate to protect children who are abused and neglected, Pereira, like other DSS investigators, was required to gain access to the homes of affected families. G. L. c. 18B, § 3 (B) (4).

In addition to her position with DSS, Pereira had been a member of the Fall River city council from 1991 to 1995, but in the fall of 1995 she lost her bid for reelection. On February 5, 1996, Pereira attended a dinner for the then outgoing Fall River city councillors, an event that is the focal point of this case. The event was hosted by the city clerk and attended by numerous city officials, community leaders of Fall River, and other guests. While a political event, members of the general public were not

judge based his decision on the fact that the arbitrator had come to a conflicting decision. See note 4, *supra.*

[7]Pereira was a "protective investigator" for the southeast region of Massachusetts, an area that includes Fall River. That region has a "significant" number of African-American clients (approximately thirteen per cent).

invited.[8] At the party, Pereira made a distasteful racial comment that the parties characterize as a "joke."[9] The following day the press reported that she had made the statement, adding, inaccurately, that it was part of her prepared remarks at the dinner.[10] Two days later, DSS placed Pereira on administrative leave, with pay. On April 10, 1996, following an internal investigation that included a hearing, the commissioner informed Pereira that her service as a DSS employee would be terminated, effective immediately.[11]

There was widespread publicity of the incident, as a result of which the DSS area director in Fall River "received numerous complaints from [DSS] clients [and] members of the community."[12] In an affidavit submitted by the defendants as part of

[8]In her brief Pereira characterizes the event at various times as "a local political dinner of adults," "a political roast," "a closed political dinner party," and "a private political gathering."

[9]The parties stipulate that Pereira said: "Why do black people have sex on their minds? Because they have pubic hair on their heads."

[10]Copies of some of the reports appearing in the print media were included in the department's submission in support of its motion for summary judgment. The reports concern Pereira's racist statement, as well as other remarks she made at the dinner that dealt with racial and ethnic intolerance in Fall River, political patronage, and election irregularities.

[11]The commissioner informed Pereira in a letter that the department was terminating her employment because she told "a grossly racist and insulting joke at a testimonial dinner held for outgoing City Councilors . . . which joke was subsequently reported in the Fall River Herald News." The letter indicated that "[t]he joke was insulting," and that "[i]t expresses views which are contrary to one of the fundamental principles under which the Department of Social Services operates: that all people who come into contact with the Department will be treated with respect, dignity and fairness." The commissioner made clear to Pereira that "[t]o have such sentiments expressed by an employee of the Department damages the ability of the agency to perform its mission, and to maintain public confidence that investigations of allegations of child abuse and neglect will be handled fairly and impartially. Your racist comment," the letter continued, "adversely affected the ability of your fellow DSS employees . . . to perform their duties, and its impact is so serious that it is no longer possible for you to continue to perform your duties as a Social Worker III for the Area Office."

[12]During the notice to show cause hearing held before a hearing officer pursuant to the collective bargaining agreement, the transcript of which was included by both Pereira and the defendants in support of their respective motions for summary judgment, the area director stated that some of the telephone calls were from members of the community, and that at least one call was from a DSS foster mother. The record also reflects that, several days after the news of Pereira's "joke" was reported, representatives of the black com-

their cross motion for summary judgment and not disputed by Pereira, the area director states that she received twenty-five telephone calls from people expressing outrage that a department employee would tell a racist "joke." It is also undisputed that one DSS employee was refused entrance into a DSS client's home because of Pereira's reported comment.[13]

## II

We consider first whether Pereira's speech is protected by the First Amendment, and, if so, whether DSS violated her rights by terminating her employment. The question would not be considered substantial if the view of Justice Holmes, expressed more than a century ago, had prevailed. In *McAuliffe* v. *Mayor & Aldermen of New Bedford*, 155 Mass. 216, 220 (1892), the court dismissed a police officer's challenge to a police regulation prohibiting the solicitation of political contributions because, "[t]he petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *Id.* This view has not prevailed. In a long line of cases the Supreme Court has clarified that, when a public employer attempts to discharge or otherwise discipline an employee who exercises a right that is constitutionally protected, the employer is subject to some restraint. See, e.g., *Keyishian* v. *Regents of the Univ. of N.Y.*, 385 U.S. 589, 605-606 (1967), quoting *Keyishian* v. *Regents of the Univ. of N.Y.*, 345 F.2d 236, 239 (2d Cir. 1965) ("the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected"). A public employer therefore "may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin* v. *McPherson*, 483 U.S. 378, 383 (1987). See *Connick* v. *Myers*, 461 U.S. 138 (1983); *Pickering* v. *Board of Educ.*, 391 U.S. 563 (1968).

---

munity of Fall River and New Bedford expressed outrage at the "joke" and the sentiments it expressed at a public meeting.

[13]During the notice to show cause hearing, one DSS social worker testified that in late February, 1996, she was denied entrance to a DSS client's home, with the client explaining to DSS that she did so "because of Linda Pereira. If DSS can hire a racist worker, then DSS must be racist." The client then expressed her feelings that she could "no longer trust that decisions that were made about her case were objective." There was other testimony that another DSS worker also had problems doing an investigation because of Pereira's statement.

To decide whether a public employee has an actionable claim for the infringement of her First Amendment rights, we must determine first, based on "the content, form, and context of [the] given statement, as revealed by the whole record," *Connick* v. *Myers, supra* at 147-148, whether the public employee was speaking "as a citizen upon matters of public concern." *Id.* at 147. The Supreme Court has distinguished between disciplinary actions taken by a public employer that require judicial scrutiny to ensure "that citizens are not deprived of fundamental rights by virtue of working for the government," and disciplinary actions for which public employers enjoy wide latitude in managing their offices. See *id.* "To be protected, the speech must be on a matter of public concern . . . ."[14] *Waters* v. *Churchill*, 511 U.S. 661, 668 (1994). If a court determines the speech to be on a matter of public concern, then the court must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering* v. *Board of Educ., supra* at 568. In addition, "the employee's interest in expressing herself on [the] matter must not be outweighed by any injury the speech could cause" to that interest. *Waters* v. *Churchill, supra* at 668.[15]

The defendants argue that Pereira's "joke" was not a matter of public concern, and therefore not protected. Pereira takes the

[14]Although a public employee's speech may not touch on a matter of public concern, it is not entirely devoid of constitutional protection. See *Connick* v. *Myers*, 461 U.S. 138, 147 (1983). "[A]bsent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of personnel decisions taken by a public agency allegedly in reaction to the employee's behavior." *Id.* See *Cohen* v. *California*, 403 U.S. 15, 25-26 (1971) ("it is nevertheless often true that one man's vulgarity is another's lyric. . . . [W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process").

[15]Even if the court determines that the public employee's First Amendment interests in speaking out outweigh a legitimate governmental interest in curbing employee speech, "the plaintiff-employee must show that the protected expression was a substantial or motivating factor in the adverse employment decision; and, if the plaintiff meets this test, the defendant governmental entity must be afforded an opportunity to show 'by a preponderance of the evidence that [it] would have reached the same decision . . . even in the absence of the protected conduct.' " *O'Connor* v. *Steeves*, 994 F.2d 905, 913 (1st Cir.), cert. denied sub nom. *Nahant* v. *O'Connor*, 510 U.S. 1024 (1993), quoting *Mt. Healthy City Sch. Dist. Bd. of Educ.* v. *Doyle*, 429 U.S. 274, 287 (1977). In

contrary position. The judge in the Superior Court apparently assumed it was; he did not consider the threshold question whether Pereira's comment constituted speech related "to any matter of political, social, or other concern to the community." *Connick* v. *Myers, supra* at 146. We reach our own determination as to that issue, because in cases raising First Amendment issues "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free speech.' " *O'Connor* v. *Steeves*, 994 F.2d 905, 912-913 (1st Cir.), cert. denied sub nom. *Nahant* v. *O'Connor*, 510 U.S. 1024 (1993), quoting *Bose Corp.* v. *Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984). See *Connick* v. *Myers, supra* at 150 n.10, quoting *Pennekamp* v. *Florida*, 328 U.S. 331, 335 (1946).[16]

Pereira's "joke" has little in common with speech the Supreme Court has examined and determined to be of "public concern"; there is little to link it to the central purpose of the First Amendment, "protecting the public marketplace [of] ideas and opinions." *Eberhardt* v. *O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994). In *Pickering* v. *Board of Educ., supra* at 566, for example, the Supreme Court determined that a letter written by a public school teacher to a newspaper attacking the school board's construction bond issue proposals was speech on a matter of public concern. *Perry* v. *Sindermann*, 408 U.S. 593, 595 (1972), considered the case of a State college professor who testified before the Legislature that a college be elevated to four-year status, to same effect. In *Mt. Healthy City Sch. Dist. Bd. of Educ.* v. *Doyle*, 429 U.S. 274, 284 (1977), the Court reached the same conclusion in a case concerning a public school teacher who released to a radio station the substance of a memorandum dealing with teacher dress and appearance. *Givhan* v. *Western Line Consol. Sch. Dist.*, 439 U.S. 410, 414 (1979), concerned a teacher who complained to a school principal about school board policies and practices relating to racial discrimina-

---

this case, the department does not dispute that Pereira was terminated because of her comment.

[16]Pereira claims that because the department did not argue this point in the trial court, it is precluded from doing so on appeal. However, "it is the court's task to apply the *Connick* test to the facts." *Waters* v. *Churchill*, 511 U.S. 661, 668 (1994). See *Connick* v. *Myers*, 461 U.S. 138, 148 n.7 (1983) ("The inquiry into the protected status of speech is one of law, not fact"). See also *Rankin* v. *McPherson*, 483 U.S. 378, 384-386 (1987).

tion. The Supreme Court described these and other matters of "public concern" as those "dealing in some way with 'the essence of self-government,' *Garrison* v. *Louisiana,* 379 U.S. 64, 74-75 (1964), matters as to which 'free and open debate is vital to informed decisionmaking by the electorate,' *Pickering* [v. *Board of Educ.,* 391 U.S. 563,] 571-572 [1968], and matters as to which 'debate . . . [must] be uninhibited, robust, and wide-open,' " *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.,* 472 U.S. 749, 755 (1985) (plurality opinion), quoting *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 270 (1964). "In short, speech on matters of public concern is that speech which lies 'at the heart of the First Amendment's protection.' " *Rankin* v. *McPherson,* 483 U.S. 378, 395 (1987) (Scalia, J., dissenting), quoting *First Nat'l Bank* v. *Bellotti,* 435 U.S. 765, 776 (1978).

In contrast to these, Pereira's comment was an off-the-cuff remark, not concerned with any "political, social, or other concern to the community." *Connick* v. *Myers, supra* at 146. Cf. *Rankin* v. *McPherson, supra* at 393 (Powell, J., concurring) ("single, offhand comment" directed to coworker concerning an attempted assassination of the President held to be matter of public comment). Prior decisions of this court also suggest that Pereira's "joke" is not a matter of "public concern." See *Harris* v. *Trustees of State Colleges,* 405 Mass. 515, 524 n.10 (1989) (disrespectful remarks by professor to other faculty members, and belittling "non-physics majors," did not relate to "issues of public concern"). Cf. *Caron* v. *Silvia,* 32 Mass. App. Ct. 271, 275-276 (1992) (public employee's statements on television program "60 Minutes" concerning smokers' rights was addressing more than her own personal concerns).

Moreover, as Pereira herself insists, she did not intend to express any message by telling her "joke." She draws a distinction between the prepared remarks she delivered — clearly speech on matters of public concern — and her "joke" told to humor another guest. We conclude that Pereira's joke was not speech on a matter of public concern. See *Tindle* v. *Caudell,* 56 F.3d 966, 970 (8th Cir. 1995) ("Amusing other guests at a private party with no showing of any intended message is not speech on a matter of public concern"). That determination should end our inquiry, for the First Amendment's protection against adverse personnel decisions extends only to speech on matters of public concern. See, e.g., *Waters* v. *Churchill, supra* at 668. See also *Rankin* v. *McPherson, supra* at 395 (Scalia, J., dissenting).

Pereira nevertheless argues that, when public employees engage in expression "unrelated to their employment while away from the workplace," the *Pickering-Connick* requirement "that the speech must be addressed to matters of public concern to be protected is not applicable."[17] She relies in this respect on decisions of the United States Courts of Appeals for the Seventh, Tenth, and Fourth Circuits, *Eberhardt* v. *O'Malley*, 17 F.3d 1023 (7th Cir. 1994); *Flanagan* v. *Munger*, 890 F.2d 1557 (10th Cir. 1989); and *Berger* v. *Battaglia*, 779 F.2d 992 (4th Cir. 1985), cert. denied, 476 U.S. 1159 (1986). Those cases are not entirely germane. In *Eberhardt* v. *O'Malley*, *supra* at 1027, the court held that a novel written by an assistant State's attorney during his off hours and potentially containing office confidences was "comfortably within the protection of the [First] [A]mendment." While the court noted that the "less . . . speech has to do with the office, the less justification the office is likely to have to regulate it," *id.*, a proposition with which we do not quarrel, it did not depart from the "public concern" prong of the *Pickering* test.

In *Flanagan* v. *Munger*, *supra* at 1562, the court found that the "public concern" prong was "nearly impossible to logically apply" to a case where an employee "engages in *nonverbal* protected expression neither at work nor about work" (emphasis added). In that case the employees were part owners of a video rental store that carried sexually explicit videos, and the court found it difficult to understand how the employees were "actually" saying anything, explicitly or implicitly, by part ownership of the store, and nothing more. *Id.* at 1562-1563. Even if the employees were "implicitly" making a statement, the court was unclear "how an implicit statement [could] sufficiently inform an issue of public concern or contribute to the debate over sexually explicit films." *Id.* at 1563. On the other hand, it found the "balancing prong" of the *Pickering-Connick* test "easy to apply," and did so. *Id.* at 1562. Here, there is no suggestion that Pereira did not "actually say" something nor is it "impossible" to apply the "public concern" prong of the *Pickering-Connick* test.

---

[17]Pereira's argument is framed in terms of the dissent of Justice Brennan in *Connick* v. *Myers*, *supra* at 157 (Brennan, J., dissenting), which noted in dictum that "[w]hen public employees engage in expression unrelated to their employment while away from the workplace, their First Amendment rights are, of course, no different from those of the general public." *Id.*

Finally, in *Berger* v. *Battaglia, supra,* the court considered whether a police department could "condition the continued employment of one of its police officers upon his cessation of off-duty public entertainment performances in blackface that members of Baltimore's black community found offensive." *Id.* at 993. Although the court acknowledged that the case presented some "conceptual problems" in that the officer's speech was "wholly unrelated in content to the public employer or its operations," it found *Pickering*'s constitutional principles "apposite and necessarily controlling." *Id.* at 997. The court held that the performances "constituted speech upon a matter of obvious public interest to . . . considerable segments of the community" and therefore entitled to First Amendment protection. Proceeding to apply the *Pickering* balancing test, the court found in favor of the employee.

There is, nevertheless, considerable force to the argument that courts should proceed to the balancing prong of the *Pickering* test when a public employee speaks away from the workplace, and does not comment on internal office affairs or on her status as an employee, whether or not her speech is on a matter of public concern.[18] See *United States* v. *National Treasury Employees Union,* 513 U.S. 454, 465 (1995) ("In *Pickering* and a number of other cases we have recognized that Congress may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large"); *Connick* v. *Myers, supra* at 154 ("For it would indeed be a Pyrrhic victory for the great principles of free expression if the Amendment's safeguarding of a public employee's right, as a citizen, to participate in discussions concerning public affairs were confused with the attempt to constitutionalize [an employee grievance]"). See also *United States* v. *National Treasury Employees Union, supra* at 480 (O'Connor, J., concurring in part and dissenting in part) ("In contrast to some of our prior decisions, this case presents no threshold question whether the speech is of public, or merely private, concern. [The public employees] challenge the ban as it applies to off-hour speech bearing no nexus to Government employment — speech that by definition does not relate to

---

[18]*Rankin* v. *McPherson,* 483 U.S. 378 (1987), is the only case in which the Court "directly applied the *Pickering* balance to speech whose content had nothing to do with the workplace." *United States* v. *National Treasury Employees Union,* 513 U.S. 454, 466 n.10 (1995).

'internal office affairs' or the employee's status as an employee"). Despite our confidence that Pereira's "joke" was neither intended as a statement on a matter of "public concern," nor carries the import of one, we proceed to the second prong of the *Pickering* analysis, balancing Pereira's interest in making her statement against the interest of DSS "in promoting the efficiency of the public services it performs through its employees." *Pickering* v. *Board of Educ., supra* at 568.

We recognize that a public employee has a strong interest in speaking her mind free from government sanction. But Pereira herself asserts no great interest in telling her "joke." Counsel for Pereira characterizes her statement as "stupid," "racist," and "unthinking." These characterizations are supported by the record: Pereira's motive was not to engage in debate, raise awareness, or press a position. See *O'Connor* v. *Steeves, supra* at 915 ("motives for speaking out are properly weighed in the balance under *Pickering*"). By her own account, Pereira's "joke" was a "racial stereotyp[ing]" retort to a "grossly sexist and vulgar joke" told by another guest. Her only motive we can discern from the record was to respond in kind to a distasteful comment of another guest. We, therefore, view Pereira's interest as "relatively insubstantial." *United States* v. *National Treasury Employees Union, supra* at 482 (O'Connor, J., concurring in part and dissenting in part).

We balance her interest in making "stupid," "racist," and "unthinking" statements with DSS's interest in preventing the expression of such statements by its investigators, in circumstances, such as the political event in this case, where there is little likelihood of privacy. The government's burden in justifying a particular discharge "varies depending upon the nature of the employee's expression." *Connick* v. *Myers, supra* at 150. See *United States* v. *National Treasury Employees Union, supra* at 483 (O'Connor, J., concurring in part and dissenting in part) ("As the magnitude of intrusion on employees' interests rises, so does the Government's burden of justification"). We recognize that, because her comment "does not involve the subject matter of Government employment and takes place outside the workplace" the department may not be able to justify Pereira's dismissal "on the grounds of immediate workplace disruption asserted in *Pickering* and the cases that followed it." *United States* v. *National Treasury Employees Union, supra* at

470.[19] Nevertheless, it is clear from the record that the impact of Pereira's "joke" was felt and DSS and the commissioner had every reason to conclude that it would interfere with DSS's goals. Pereira could have had no reasonable expectation that her remarks would not be overheard or acted on: the event was political and public, even though not open to the general public.[20] See *Tindle* v. *Caudell*, 56 F.3d 966, 972 (8th Cir. 1995) ("There was the potential for more direct consequences to the department than if [she] had attended a family or neighborhood party . . ."). While a "showing of actual disruption is not always required in the balancing process under *Pickering*," *id.*, citing *Shands* v. *Kennett*, 993 F.2d 1337 (8th Cir. 1993), cert. denied, 510 U.S. 1072 (1994), there was objective evidence that Pereira's behavior had affected the integrity of DSS in the Fall River community. The "joke" carried the "clear potential" for undermining DSS relations with its clients and the larger community where trust and confidence may be critical. See *Connick* v. *Myers*, *supra* at 152.

Even if Pereira's "joke" had not generated the heated public response that it did, we recognize the interest of the department in disciplining Pereira. Investigators, such as Pereira, face the often difficult task of making unwelcome investigations into the lives and homes of citizens. This is the State operating, as it must to protect the lives and well-being of infants and children, in a highly intrusive manner. DSS cannot take the risk that it will be spurned by the community — or by a single adult — because its investigators are biased or lack judgment. To be effective, DSS and its investigators must both be, and be perceived to be, impartial and fair. Pereira's "racist" comment (as she herself characterizes it) undermined those goals. See *Rankin* v. *McPherson*, *supra* at 390 ("in weighing the State's interest . . . some attention must be paid to the responsibilities of the employee within the agency"). The commissioner was understandably concerned about the appearance of racial bias in the department's investigators. At the very least Pereira exhibited outstandingly poor judgment, and poor judgment is inconsistent with the task often fraught with difficulties that investigators

---

[19]Pereira did not, however, take an appeal from the arbitrator's conclusion that there was a "meaningful and substantial nexus" between her offensive conduct and her work responsibilities. See note 4, *supra*.

[20]Pereira describes herself as "a controversial political figure" who showed "political naivete on the issue of public relations."

face every day. See *United States* v. *National Treasury Employees Union, supra* at 494 (Rehnquist, C.J., dissenting) (government's foremost interest is to prevent impropriety and appearance of impropriety).

We defer to the commissioner's judgment that a DSS investigator must behave in a manner that "leaves no doubt" as to her ability and willingness "to treat families of diverse racial and ethnic backgrounds with respect, dignity, and fairness." See *Waters* v. *Churchill*, 511 U.S. 661, 673 (1994) (Court has "consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large"); *Connick* v. *Myers, supra* at 151-152 ("When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate"). We agree with the commissioner's assessment that Pereira's "joke" was "unprofessional" and "totally at odds with the judgment and sensitivity required to perform [the] duties" of a DSS investigator.

It is not our task to determine whether the commissioner's decision to discipline Pereira was wise, or whether the sanction she selected was appropriate. Our task is to decide whether Pereira had the right to say what she did "so that she could not only not be fired for it, but could not be formally reprimanded for it, or even prevented from repeating [her joke] endlessly into the future." *Rankin* v. *McPherson, supra* at 399 (Scalia, J., dissenting). The great value of the constitutional right of free speech does not require that outcome. A public employee who makes a "stupid," "racist," and "unthinking" remark in circumstances that damage the effectiveness or integrity of her employing agency is not entitled to claim that she is naive about the consequences of her speech and thereby protected from the obvious consequences of her behavior. The department, in our view, has met its burden.

## III

The commissioner challenges the judge's determination that the action did not entitle her to the benefit of qualified immunity. A public official who performs a discretionary function may be shielded from civil liability in an action pursuant to 42 U.S.C. § 1983 by the doctrine of qualified immunity. See *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 & n.30 (1982). See also

*Gildea* v. *Ellershaw*, 363 Mass. 800, 820 (1973). To overcome a claim of qualified immunity, a plaintiff must show that the State official directly participated in violating a right of the plaintiff that is "clearly established." See *Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987) (right must be clearly established so that a "reasonable official" would understand that her actions violate the right). In light of our conclusion that no right of Pereira was violated, it follows that she has no claim under 42 U.S.C. § 1983. We need not, therefore, address the parties' arguments regarding the availability of a qualified immunity defense. See *Estate of Gilmore* v. *Buckley*, 787 F.2d 714, 723 (1st Cir.), cert. denied, 479 U.S. 882 (1986). We note, however, that while her constitutional right of free speech is "clearly established," the line drawing mandated by *Pickering* is by no means clear where the speech at issue took place off duty and had nothing to do with the workplace, but had a demonstrable impact on the department.

The judgment of the Superior Court granting summary judgment for Pereira on her civil rights claim and denying the commissioner qualified immunity is reversed. Judgment is to be entered for the defendants.

*So ordered.*