69 F.3d 532
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Brendhan B. HARRIS, Plaintiff-Appellee,
v.
The CITY of Virginia Beach, Defendant-Appellant,
and
G.M. VAN AUKEN, III, Lieutenant; M.E. Beane, Captain; W.W.
Baker; D.G. Mccloud, Major; Charles R. Wall, Individually
and as Officer of the Department of Police, City of Virginia
Beach, Virginia; Fagan D. Stackhouse, Individually and as
the Director of the Department of Human Resources, City of
Virginia Beach, Virginia; James K. Spore, Individually and
in his official capacity as City Manager of the City of
Virginia Beach, Virginia, Defendants.
Brendhan B. HARRIS, Plaintiff-Appellant,
v.
The CITY of Virginia Beach; G.M. Van Auken, III,
Lieutenant; M.E. Beane, Captain; W.W. Baker; D.G.
Mccloud, Major; Charles R. Wall, Individually and as
Officer of the Department of Police, City of Virginia Beach,
Virginia; Fagan D. Stackhouse, Individually and as the
Director of the Department of Human Resources, City of
Virginia Beach, Virginia; James K. Spore, Individually and
in his official capacity as City Manager of the City of
Virginia Beach, Virginia, Defendants-Appellees.
 No. 94-2091, 94-2122.
 United States Court of Appeals, Fourth Circuit.
 Oct. 30, 1995.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk. Raymond A. Jackson, District Judge. (CA-93-1151-2)
 E.D.Va.
 REVERSED AND REMANDED.
 ARGUED: L. Steven Emmert, CITY ATTORNEY'S OFFICE FOR THE CITY OF VIRGINIA BEACH, Virginia Beach, Virginia, for Appellant. Abram William VanderMeer, Jr., CLARK & STANT, P.C., Virginia Beach, Virginia, for Appellee.
 OPINION
 PER CURIAM:
 
 
 1
 The City of Virginia Beach (the City) appeals from a jury verdict in favor of Brendhan B. Harris regarding the City's decision to terminate his employment as a police officer. Harris sued the City, claiming that in terminating his employment the City violated his First Amendment rights, pursuant to 42 U.S.C. Sec. 1983, and wrongfully terminated him under Virginia state law. The primary issue raised by the City on appeal turns on the district court's ruling that, as a matter of law, the First Amendment protected Harris's conduct in this case under Pickering v. Board of Education, 391 U.S. 563 (1968), and Connick v. Myers, 461 U.S. 138 (1983). Harris, on the other hand, cross-appeals from the district court's decisions (1) to grant qualified immunity to a number of the individual defendants,[1] (2) to deny his motion to amend his complaint to name additional defendants, and (3) to modify the jury's damage award by reducing the future damages award and setting aside the punitive damages award. For the reasons that follow, we conclude that the district court erred in ruling that Harris's speech, as a matter of law, was protected by the First Amendment. Accordingly, we reverse and remand for further proceedings on the state law claim.
 
 I.
 
 2
 This case concerns the City of Virginia Beach's termination of Brendhan B. Harris, one of its police officers. On August 28, 1992, the police department dispatched Harris to the Lake Edward Apartments to respond to a tenant's complaint of an unauthorized entry into her apartment. When Harris arrived at the apartment complex, he spoke with the tenant, Terry Grey, and concluded that the intruder was likely a maintenance man for the apartment complex. Harris went to see the apartment complex's manager, Colette Goodfellow, to confirm his analysis. Goodfellow went to find the maintenance man and shortly thereafter returned with a work order directing the maintenance man to perform repairs in Terry Grey's apartment. However, Grey grabbed the work order from Goodfellow's hand and refused to let it go. Harris then attempted to retrieve the work order from Grey and return it to Goodfellow. When Harris grabbed Grey's wrist, Diedre Gamble--Grey's sister who had arrived at the scene some moments before--physically attacked Harris. After a brief struggle, Harris subdued Gamble by spraying her with pepper gas.
 
 
 3
 Once he had subdued Gamble with the pepper spray, Harris took Gamble into custody and transported her to a nearby hospital for treatment. En route, Harris reported the incident to his immediate supervisor, Lieutenant Gary Van Auken. Near this time, however, Anthony Ortiz, another police officer who had arrived at the apartment complex during the altercation, reported to Van Auken that Harris had acted improperly in his handling of the incident.
 
 
 4
 After the hospital treated Gamble, Harris transported her to police headquarters with the intention of taking her before a magistrate to charge her with assault and battery in connection with the incident. Van Auken, however, directed Harris to call him from the magistrate's office. Over the course of several ensuing telephone calls, Van Auken instructed Harris to release Gamble from custody so that she could file a complaint against Harris with Sergeant Vanderheiden of the Internal Affairs Division. He also directed Harris to do nothing further in this matter.[2] After securing legal advice, Harris gave his own statement to Vanderheiden of the events that had occurred. Harris then proceeded to the magistrate's office and swore out warrants against both Diedre Gamble and the tenant Terry Grey.[3] The warrant against Gamble was served; however, before the warrant against Grey could be served, Captain E.E. Rorrer directed Harris to relinquish it to Van Auken. When Harris delivered the Grey warrant to Van Auken, Van Auken placed it in his desk drawer.
 
 
 5
 On September 30, 1992, a trial on Harris's charges against Gamble was held before a Virginia Beach General District Court. When the court called the case, Van Auken handed the judge a letter dated September 29, 1992, that Van Auken had prepared and initialed on behalf of Captain M.E. Beane. The letter advised the court that the City desired to nolle prosequi the Gamble charges. The court responded by dismissing the case against Gamble without prejudice.
 
 
 6
 Subsequently, the Internal Affairs Division released the results of its investigation of Harris's actions. The Internal Affairs Division report criticized Harris's role in the events at the apartment complex. As a result of the report, the department took the following disciplinary action against Harris: a four-hour suspension for violation of Van Auken's order not to proceed further against Gamble and Grey and a four-hour suspension for the use of unnecessary force against Grey with the pepper spray.
 
 
 7
 As Harris continued to pursue the matter, the City responded with orders to discontinue his personal investigation during office hours. By a letter of September 30, 1992, Rorrer instructed Harris not "to pursue this matter further as a police officer," and not to take any action against Grey or Gamble while on duty. (J.A. 317). The letter specifically instructed Harris that if he were to proceed any further with the matter, he "must wear plainclothes [sic] and clearly represent [him]self as a private citizen." (J.A. 317). Finally, in case any of the above was ambiguous, Captain Rorrer made clear to Harris that "[i]f you have any doubts or concerns about what to do, you are to personally contact me and I will make it clear to you." (J.A. 318).
 
 
 8
 On October 17, 1992, Harris filed an internal complaint about the conduct of Van Auken and Rorrer regarding their actions (1) directing that Gamble be released from custody, (2) withholding service of the warrant against Grey, and (3) providing false information to the Virginia Beach court in connection with the Gamble charges. Late in 1992, while the investigation was pending, the City assigned Harris to a different precinct, under different supervisors, apparently to ease tensions. On January 19, 1993, after conducting an investigation, Chief Charles Wall issued a report advising Harris that his complaint against Van Auken and Rorrer was unfounded. Harris then requested that a citizen review board review Wall's decision, but this request was denied by a memorandum order of March 9, 1993.
 
 
 9
 On July 30, 1993, more than eleven months after the Lake Edwards Apartments incident and seven months after his transfer, Harris appeared before a magistrate to swear out a criminal complaint against Van Auken. Although this event took place after midnight, Harris was on duty and in his police uniform. According to Harris, his motive for swearing out the complaint was his fear that the statute of limitations would run on August 28, 1993. Harris testified before the magistrate judge that Van Auken was guilty of criminal conduct in directing the release from custody of Gamble, withholding service of the Grey warrant, and submitting the allegedly false letter to the court to obtain a dismissal of the Gamble case. As a result of Harris's testimony, the magistrate judge found probable cause and issued criminal summonses against Van Auken for (1) obstructing justice, based on Van Auken's original order to Harris directing him to release Gamble to the Internal Affairs investigator and the nolle prosequi request on the Gamble case to the judge, and (2) corruptly withholding service of the Grey warrant.
 
 
 10
 The issuance of the summonses against Van Auken apparently set off shock waves in the command structure of the police department. On August 6, 1993, Police Chief Charles Wall called a meeting attended by Van Auken, and Captains Rorrer, Beane, and Baker, in which the group reached a consensus to dismiss Harris. Captain Beane prepared a Personal Conduct Report stating the reasons for Harris's termination. On August 19, 1993, the City officially terminated Harris's employment as a police officer, ostensibly for the reasons given in the Personal Conduct Report.[4]
 
 
 11
 Harris appealed his dismissal to the City's Personnel Review Board (the "Board"). On September 2, 1993, the Board held a full hearing. On September 7, 1993, the Board affirmed the dismissal in a written order. At that time, Harris's dismissal became final. Harris maintains that his dismissal was in direct retaliation for his appearance before the magistrate judge to get the issuance of the warrants against Van Auken.[5]
 
 
 12
 Harris filed an initial complaint in federal court against the City, Van Auken, Beane, and other City officials, on November 23, 1993, and a first amended complaint on December 7, 1993.[6] In Count I of the amended complaint, Harris alleges, pursuant to 42 U.S.C. Sec. 1983, that the defendants violated his First Amendment right to swear out the complaint against Van Auken. In Count II, Harris alleges retaliatory discharge under provisions of the Virginia state and local codes prohibiting dismissal because a state employee reports a violation of the law. Before trial, the district court ruled that under Pickering and Connick: (1) Harris's speech was of "public concern," and, accordingly, protected under the First Amendment as a matter of law; and (2) the issue of whether the City had fired Harris because he had engaged in protected conduct, rather than for illegitimate reasons, presented a genuine issue of material fact for the jury.
 
 
 13
 The case proceeded to trial on the merits before a jury, beginning on July 19, 1994. At the close of all the evidence, the district court ruled that the individual defendants were entitled to qualified immunity. Accordingly, it dismissed Harris's constitutional claims against them in their individual capacities, but still allowed Harris to proceed against them individually under Count II, the state law claim. The jury found the City liable to Harris for the following: (1) $41,712 in compensatory damages on his Sec. 1983 claim; and, (2) $125,000 in compensatory damages on his wrongful termination claim for "loss of professional opportunity" and $200,000 in punitive damages. The jury held each of the individual defendants liable for $100 in punitive damages.
 
 
 14
 With the jury verdict rendered, the district court proceeded to issue a series of orders on a variety of issues surrounding liability and damages. On July 28, 1994, the district court entered its own findings of fact and conclusions of law on the equitable relief Harris sought. First, the district court held firm to its earlier rulings under Connick that, as a matter of law, Harris's speech was protected under the First Amendment. Second, the district court explicitly ruled that, as a matter of law, under Connick the value of Harris's speech outweighed the City's interests in efficiently operating the police department. Third, the district court ordered the City to reinstate Harris to his position, to compensate him with back pay of $43,000, and otherwise to make him whole. Finally, the district court struck the jury's award of punitive damages against the individual defendants. On August 11, 1994, the City moved the court for post-judgment relief. On November 4, 1994, the district court granted the City's motion in part, striking the jury's award of punitive damages against the City and reducing the jury's award of compensatory damages for loss of professional opportunity from $125,000 to $99,188. In sum, after all of the post-trial maneuvering was concluded, the City was liable to Harris for compensatory damages of $41,712 on his Sec. 1983 claim, $99,188 on the wrongful termination claim, back pay of $43,000, and reinstatement. Harris and the City both appealed.
 
 II.
 
 15
 A public employee may not be discharged for exercising his or her First Amendment right to free speech. Connick v. Myers, 461 U.S. 138, 142 (1983); Pickering v. Board of Educ., 391 U.S. 563, 574 (1968). In determining whether a discharged public employee has alleged a valid cause of action under Sec. 1983, we are "to seek 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " Connick, 461 U.S. at 142 (quoting Pickering, 391 U.S. at 568). Under Connick -Pickering, the district court is to adhere to the following analytical structure:
 
 
 16
 In order to establish a retaliatory discharge claim under the First Amendment, a public employee must meet a twopronged test. First, to trigger First Amendment protection, the speech at issue must relate to matters of public interest, Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983), and the employee's interest in First Amendment expression must outweigh the employer's interest in efficient operation of the workplace. Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Second, the employee must demonstrate that his protected speech was a substantial factor in the employer's termination decision. Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).
 
 
 17
 Hanton v. Gilbert, 36 F.3d 4, 6-7 (4th Cir.1994). Under this approach, the preliminary issue to determine is whether the speech touches upon a matter of public concern; if it does not, we go no further. Holland v. Rimmer, 25 F.3d 1251, 1255 n. 11 (4th Cir.1994).
 
 
 18
 Whether speech touches upon a matter of public concern under Connick and Pickering is a question of law for the district court and, accordingly, is reviewed de novo on appeal. Hall v. Marion Sch. Dist. No. 2, 31 F.3d 183, 192 (4th Cir.1994); Holland, 25 F.3d at 1255; see also Shands v. City of Kennett, 993 F.2d 1337, 1343 (8th Cir.1993) (applying Connick-Pickering review de novo where issue raised for first time on appeal), cert. denied, 114 S.Ct. 880 (1994). As we have recently explained:
 
 
 19
 Because almost anything that occurs within a public agency could be of concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee. Rather, our task is to decide whether the speech at issue in a particular case was made primarily in the plaintiff's role as citizen or primarily in his role as employee. In making this determination, the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment.
 
 
 20
 DiMeglio v. Haines, 45 F.3d 790, 805 (4th Cir.1995) (quoting Terrell v. University of Texas Sys. Police, 792 F.2d 1360, 1362 (5th Cir.1986), cert. denied, 479 U.S. 1064 (1987)). Whether Harris's speech fairly relates to an issue of public concern turns on the content, form, and context of the speech. Connick, 461 U.S. at 147-48.
 
 
 21
 It is evident from the record that Harris's conduct in this case provides a classic example of speech that does not touch upon a public concern under Connick-Pickering. Harris maintains that his supervisor's actions in this affair and the subsequent internal investigation were criminal in nature, and therefore, necessarily of public concern. We disagree. There is insufficient evidence in the record, as a matter of law, to show that in swearing out the complaint Harris was acting as a public citizen concerned with police corruption, as opposed to acting as a police officer embroiled in a personnel dispute. We recently made clear that
 
 
 22
 [b]y 1990, the Supreme Court had repeatedly emphasized that the Pickering doctrine developed to protect the right of a public employee "as a citizen, [to] comment[ ] upon matters of public concern." Connick, 461 U.S. at 143, 103 S.Ct. at 1688 (emphasis added). Although the Court had not expressly held that speech uttered within the employee's public capacity was not protected, the Court had distinguished between speaking as a citizen and as an employee, and had focused on speech as a citizen as that for which constitutional protection is afforded.
 
 
 23
 DiMeglio, 45 F.3d at 805; see also Berger v. Battaglia, 779 F.2d 992, 999 (4th Cir.1985) (noting that our inquiry should determine "whether the 'public' or the 'community' is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a 'private' matter between employer and employee"), cert. denied, 476 U.S. 1159 (1986).[7]
 
 
 24
 Here, swearing out the criminal complaint dealt less with matters of police wrongdoing and more with Harris's criticism of the way his superiors treated his actions surrounding the underlying incident. While Harris's allegations of police corruption may have incidentally related to a public concern, nothing in the record indicates that this was Harris's primary objective in swearing out the complaint. In short, this speech simply does not concern a matter of police corruption; rather, this speech showed Harris's disagreement with his supervisor's discretionary decision not to pursue an investigation. As we have repeatedly made clear:
 
 
 25
 If the speech relates primarily to a matter of "limited public interest" and does not "seek to bring to light actual or potential wrongdoing or breach of public trust," centering instead on matters primarily, if not exclusively "of personal interest" to the employee such as employee grievances over internal working conditions, etc., that fact must be weighed in determining whether a matter of true public concern is involved for the "First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs."
 
 
 26
 Jurgensen v. Fairfax County, 745 F.2d 868, 879 (4th Cir.1984) (quoting Connick, 461 U.S. at 148-49).
 
 
 27
 Harris's position is further weakened by the manner and form in which he chose to direct his speech. The uncontroverted evidence establishes that Harris was under direct order not to pursue matters relating to the incident while on duty as an employee. Harris explicitly disregarded this directive. The primary example of this is Harris's decision to ignore the Captain's request that he not "pursue this matter further as a police officer," or take any action against Grey or Gamble while on duty. Harris disobeyed this order by swearing out the complaint while on duty and in a police uniform. Doing so was not only in violation of department orders, but also, by wearing his uniform, likely conveyed to the state magistrate tacit authority for issuing a criminal warrant to a police officer. Therefore, Harris's speech not only concerned what was essentially an employment dispute, but also was voiced in such a manner that indicated Harris was acting as a state employee rather than as a private citizen. Accordingly, based on the record before us, we conclude that, as a matter of law, Harris's swearing out of the criminal complaint against his supervisors did not touch upon a matter of public concern under Connick-Pickering.
 
 
 28
 A similar case from the Fifth Circuit involving internal police investigations and the application of Connick -Pickering further supports our reasoning. In Gillum v. City of Kerrville, 3 F.3d 117 (5th Cir.1993), cert. denied, 114 S.Ct. 881 (1994), the plaintiff police officer learned from a reliable confidential informant that the city police chief had used drugs with a convicted felon. The officer pursued his own official investigation into the matter; at some point, however, the officer was informed that he was relieved of his duties on the case because Internal Affairs would conduct a formal probe. Sensing a coverup, the officer protested and eventually left the office stating that he would not compromise his badge. Although it was disputed whether the city terminated him or whether he resigned, the officer claimed that he had a protected First Amendment right to express his opinion concerning the case to his superiors. The Fifth Circuit disagreed, reasoning as follows:
 
 
 29
 In Terrell v. University of Texas Sys. Police, 792 F.2d 1360 (5th Cir.1986), cert. denied, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987), we did not focus on the inherent "importance" of the subject matter of the speech, but on the extent to which the terminated employee spoke as a citizen or employee. In Terrell, as in this case, the employee did not speak as a citizen, but as an employee embroiled in a personal employment dispute. Id. at 1363. This focus on the hat worn by the employee when speaking rather upon the "importance" of the issue reflects the reality that at some level of generality almost all speech of state employees is of public concern.
 
 
 30
 * * * *
 
 
 31
 Whether [the police chief] broke the law is of public concern, but that was not [the officer's] focus. Instead, [the officer] disputes his role in the internal investigation. To be sure, corruption in an internal affairs department is a matter of public concern. [The officer's] focus was, however, on this issue only insofar as it impacted his wish to continue his investigation.
 
 
 32
 Gillum, 3 F.3d at 120-121. See also McMurphy v. City of Flushing, 802 F.2d 191, 196-98 (6th Cir.1986) (police officer's accusations against his superiors made in spite did not touch upon a public concer under Pickering ).
 
 
 33
 Likewise here, the record indicates that Harris swore out the warrant against his supervisor for his own personal vindication, and any interest he may have had in exposing police corruption was only incidental to his own personal grievance. Because Harris's swearing out of the complaint did not implicate a subject of public concern, as a matter of law, we reverse the district court's ruling to the contrary.[8]
 
 III.
 
 34
 Both Harris and the City offer a number of arguments concerning the state law cause of action for wrongful termination, which is the only claim remaining after our previous discussion. The City's primary argument on appeal is that if the Sec. 1983 claim fails, which we have so ruled, then the state law claim must also fail as a matter of law. In support of its argument, the City points to Zicca v. City of Hampton, 397 S.E.2d 882 (Va.1990), and Angle v. Overton, 365 S.E.2d 758 (Va.1988), for two propositions. First, the City maintains that any decision issued by a personnel board configured pursuant to Va.Code Ann. Sec. 15.1-7.1 (Michie 1989) is binding on both parties. Zicca, 397 S.E.2d at 883. Second, the City contends that resort to the courts may be had only to the extent necessary to implement the board's decisions. Angle, 365 S.E.2d at 759. According to the parties, the district court ruled that while personnel board decisions might ordinarily be binding and non reviewable, an exception exists for cases involving constitutional claims. The City argues that because the constitutional claim fell, the personnel grievance board decision necessarily becomes binding and non-justiciable. However, we have no record on appeal of any such ruling and are now presented with not only the issue of the application of Zicca and Angle to this case, but also--for the first time--the validity of the state law claim where the accompanying constitutional claim has failed.
 
 
 35
 We believe the more appropriate course of action is to allow the district court the initial opportunity to address these issues, now presented for the first time because of our ruling. Our summary disposition of Harris's state law claim is in no way intended to limit the district court's focus or to predetermine its analysis on remand concerning the application of Virginia law in this case. However, on remand, the district court may also wish to consider any other relevant issues, such as whether to retain supplemental jurisdiction over Harris's state law claim.[9]
 
 IV.
 
 36
 For the reasons offered above, we reverse the district court's ruling that Harris had a protected First Amendment speech right in the actions he took in this case. We remand this matter to the district court for further proceedings not inconsistent with this opinion.
 
 
 37
 REVERSED AND REMANDED.
 
 HEANEY, Senior Circuit Judge, dissenting:
 
 38
 Officer Brendhan Harris was fired from the City of Virginia Beach Police Department for standing before a magistrate and making allegations of criminal wrongdoing by a supervisor. So found the district court. By overturning the jury verdict in favor of Harris, this court compounds the wrong done to Harris when he was wrongfully terminated.
 
 
 39
 Few matters merit greater public concern than allegations of corruption, dishonesty, and illegality within the ranks of law enforcement. Because the majority opinion reaches a contrary conclusion, I dissent. I believe that a proper application of the principles of Pickering v. Board of Educ., 391 U.S. 563 (1968), and its progeny, see Rankin v. McPherson, 483 U.S. 378 (1987), Connick v. Myers, 461 U.S. 138 (1983), to the facts of this case requires that we affirm the jury's verdict in favor of Brendhan Harris.
 
 
 40
 I. Threshold Inquiry: "Matters of Public Concern"
 
 
 41
 The majority opinion concludes that, as a matter of law, Harris's statements to the magistrate accusing Van Auken of criminal conduct did not touch upon a matter of public concern. In so holding, the majority misconstrues the thrust of Connick 's threshold inquiry into whether an employee's speech can be "fairly characterized as constituting speech on a matter of public concern." Id. at 146. As a component of that test, Connick requires us to examine Harris's statements to the magistrate on the basis of their "content, form and context ... as revealed by the whole record." Id. at 147. As that phrase has been interpreted, "content" embodies the objective meaning of an employee's speech, while "context" refers, in part, to the subjective intent and motivation of the employee. The majority opinion not only errs by emphasizing context to the exclusion of content, but also errs in finding that Harris's principal motivation was personal in nature.
 
 
 42
 Connick states that we must determine whether Harris spoke "as a citizen upon matters of public concern," or, alternatively, "as an employee upon matters only of public interest." Id. at 148. In making that assessment, courts have taken a variety of approaches to the relative weights to be accorded context and content. The Ninth Circuit has emphasized content, focusing on " 'which information is needed or appropriate to enable the members of society' to make informed decisions about the operation of their government." McKinley v. City of Eloy, 705 F.2d 1110, 1113-14 (9th Cir.1983) (quoting Thornhill v. Alabama, 310 U.S. 88, 102 (1940)). As the First Circuit has observed, the Ninth and Tenth Circuits, see Koch v. City of Hutchinson, 847 F.2d 1436 (10th Cir.) (en banc), cert. denied, 488 U.S. 909 (1988), have effectively provided "per se protection to public-employee speech on certain topics of 'inherent' public interest, such as official malfeasance or abuse of office." O'Connor v. Steeves, 994 F.2d 905, 913 (1st Cir.1993). At the other end of the speech spectrum, other courts have adopted a similar per se rule for employee speech motivated solely by private concerns. See, e.g., Callaway v. Hafeman, 832 F.2d 414, 417 (7th Cir.1987) ("[W]hile the content of [plaintiff's] communications touched on an issue of public concern generally ... such speech stands unprotected from employer scrutiny when uttered in the pursuit of purely private interests.") (emphasis added).
 
 
 43
 In cases where the employee's speech is not so easily classifiable, some courts have emphasized the importance of the content of the speech. See, e.g., Breuer v. Hart, 909 F.2d 1035, 1039 (7th Cir.1990) (content is "the greatest single factor in the Connick inquiry"); Brawner v. City of Richardson, 855 F.2d 187, 191-92 (5th Cir.1988) (police department's alleged cover-up of internal investigations was "a matter of public interest and therefore deserves constitutional protection"). Others have concentrated on the employee's subjective intent. See, e.g., Linhart v. Glatfelter, 771 F.2d 1004, 1010 (7th Cir.1985) (Connick "requires us to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?").
 
 
 44
 Connick suggests that all three elements of the public concern test--content, form, and context--should generally be considered in the analysis. More importantly for the purposes of this appeal, I find in Connick firm support for the proposition that certain statements, i.e., those touching on core First Amendment values or inherent public concerns, will survive the threshold test even if an employee may have been partially motivated by personal concerns. In Connick, an assistant district attorney circulated a questionnaire within her office "concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." 461 U.S. at 141. The Court ruled that the content of only one question touched upon a "matter of interest to the community"--that concerning pressure to work in political campaigns. Though the assistant district attorney was motivated by her desire to avoid a transfer to another department, the Court nevertheless proceeded to evaluate that question in isolation, moving on to the balancing step in the Pickering analysis. Id. at 149-154. The First Circuit has commented:
 
 
 45
 The separate treatment given the one item of "inherent public concern" on the employee questionnaire is consistent with our exempting such clear First Amendment speech from the full-scale threshold inquiry into the employee's motives in speaking, undertaken in Connick in relation to the other items on the questionnaire.
 
 
 46
 O'Connor, 994 F.2d at 914 n. 5. The Third Circuit has taken a similar view: "Were motivation rather than content dispositive [in Connick ], the Court would have had no reason to isolate the one question that was of public concern." Zamboni v. Stamler, 847 F.2d 73, 78 (3rd Cir.), cert. denied, 488 U.S. 899 (1988).
 
 
 47
 In contrast to today's decision, the Fourth Circuit has previously aligned itself firmly with the "content-based" view: "Although the Connick court did not elaborate on the relative weight to be accorded these three factors, this court has held that 'content, subject-matter, is always the central aspect.' " Arvinger v. Mayor of Baltimore, 862 F.2d 75, 79 (4th Cir.1988) (quoting Jackson v. Bair, 851 F.2d 714, 720 (4th Cir.1988)). Accordingly, I cannot concur in the majority opinion's analysis to the contrary.
 
 
 48
 The majority opinion's narrow focus on subjective intent to the exclusion of objective content generates perverse incentives for corrupt government officials to take aggressive disciplinary action against employees who learn of their misdeeds. Suppose, for example, that two employees of a government agency suspect illegality on the part of superiors. Employee A makes public disclosure of his knowledge. Employee B investigates and opposes her superiors' actions within the agency and threatens to go public if the practices are not stopped. Her actions are rewarded with a bogus letter of reprimand and other internal disciplinary measures devised by her corrupt superiors, and only then does she decide to go public with her knowledge. Both employees are fired after speaking publicly. Even if Employee A and Employee B were to say the same words, it would be less likely that Employee B's speech would be held to touch on a matter of public concern because she would appear to be acting in response to the disciplinary actions. Confronted with a potential whistleblower, the corrupt official may believe that he can later fire that employee with relative impunity if he first fabricates an internal job-related dispute before the employee goes to the public in order to create a presumption of self-interested motivation. By making employee motivation dispositive of the threshold Connick test, the majority opinion contradicts not only Connick, but common sense.
 
 
 49
 In my view, the statements made by Harris to the magistrate fall within the category of speech of such inherent public concern that it is entitled to First Amendment protection. "[S]peech disclosing public corruption is a matter of public interest and therefore deserves constitutional protection." Solomon v. Royal Oak Twp., 842 F.2d 862, 865 (6th Cir.1994). Harris stated to the magistrate that Van Auken was guilty of criminal misconduct for ordering Gamble released from custody, withholding service of the Grey warrant, and making false statements to the court to secure the dismissal of the Gamble case. The majority finds no evidence in the record that Harris was motivated by a concern for police corruption. In my view, there was no evidence in this record that Harris was motivated solely by personal interests. To the contrary, my review of the record convinces me that Harris was motivated by both private and civic impulses: He was angry that he had been wronged by his superiors, but also by the fact that his superiors' actions had, he believed, been in violation of the law. If his superiors did, in fact, break the law, then it should make no difference whether the person blowing the whistle was a victim of the criminal conduct or merely a disinterested bystander. "Wrongdoing may often be revealed to the proper authorities only by those who have a personal stake in exposing wrongdoing." Breuer, 909 F.2d at 1039. In sum, I maintain, as have several of our sister circuits in recent years, that employees who expose corruption and illegality enjoy the protection of the First Amendment, regardless of motivation. See, e.g., Orange v. District of Columbia, 59 F.3d 1267, 1272-73 (D.C.Cir.1995); Feldman v. Philadelphia Hous. Auth., 43 F.3d 823, 829 (3rd Cir.1994); Swineford v. Snyder County Pa., 15 F.3d 1258, 1272 (3rd Cir.1994); Powell v. Gallentine, 992 F.2d 1088, 1091 (10th Cir.1993).
 
 
 50
 The City makes much of the fact that Harris appeared before the magistrate in uniform, thus violating a direct order of a superior officer. This fact has little or no bearing on the threshold Connick inquiry. Whether Harris's violation of the order would have furnished an independently sufficient ground for his dismissal is a component of the second Connick prong, which incorporates the burden-shifting regime of Mt. Healthy City Sch. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977), and which was a question of fact decided by the jury.
 
 
 51
 For these reasons, I would hold that, as a matter of law, Harris's statements to the magistrate touched on a matter of public concern and therefore merit the protection of the First Amendment.
 
 II. Causation Inquiry
 
 52
 The City does not appear to contest that Harris's exercise of his right to speak to the magistrate about illegal acts by superiors was a substantial factor in its decision to terminate. See Mt. Healthy, 429 U.S. at 287. The jury found in favor of Harris on this prong of the Connick-Pickering regime, and did not accept the City's theory that Harris's insubordination in itself would have resulted in his termination.
 
 III. Balancing of Interests
 
 53
 The third prong of the Connick-Pickering test requires courts "to balance the significance of the interests served by public-employee speech--including the employee's interests in communicating, and the interests of the community in receiving, information on 'matters of public importance'--against the governmental employer's legitimate interests in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." O'Connor, 994 F.2d at 915 (citing Pickering, 391 U.S. at 568-575). The district court ruled that Harris's "interest in speech before the magistrate clearly outweighed the City of Virginia Beach Police Department's interest in the effective and efficient fulfillment of its responsibilities." The court elaborated:
 
 
 54
 Of critical importance the court finds here in speaking before the magistrate plaintiff Harris sought to fulfill the very oath that he had taken as a police officer to arrest and seek to bring to justice those whom he had suspected that had committed crimes....
 
 
 55
 Against Harris's interest in reporting, and the community's interest in learning about, alleged criminal activity, the district court balanced the police department's legitimate interest in maintaining efficiency and morale. In making this determination, the court dismissed the City's argument that Harris had abused his position by noting that he had broken no law in appearing before the magistrate and that the order requiring him not to so appear was of "dubious legality." The court found that "it was more likely the police officials' conduct ... would serve to undermine the effective and efficient management [of the department]." I agree.
 
 
 56
 Harris, after all, made an allegation not of mere incompetence or wasteful spending, but of criminal wrongdoing by one of those entrusted to enforce the laws. We need not fear a flood of litigation against police supervisors if Harris's verdict were allowed to stand, because any officer making a false or reckless allegation would be subject to dismissal on that basis. Assuming that criminal activity by police officials is rare, so too would be suits such as Harris's. There is little likelihood that many officers would risk termination by making false or reckless allegations. In my view, the balance of competing interests under Pickering favors Harris and the public disclosure of allegations of police corruption. See, generally, Wulf v. City of Wichita, 883 F.2d 842, 860-62 (10th Cir.1989). Accordingly, I would affirm the district court.
 
 IV. Conclusion
 
 57
 Because I agree with the district court that Harris has satisfied each of the elements of the Connick-Pickering test for public employee retaliatory discharge claims, I would affirm the jury verdict returned below.
 
 
 58
 On all other issues raised by the parties but not reached in the majority opinion, I would affirm the rulings of the district court.
 
 
 
 [1]
 Charles R. Wall, Fagan D. Stackhouse, James K. Spore, Leslie L. Lilley, G.M. Van Auken, M.E. Beane, W.W. Baker, and D.G. McCloud
 
 
 [2]
 Van Auken also directed Vanderheiden to go to the magistrate's office to process Gamble's complaint. Harris claims that he was surprised by Van Auken's orders because general policy was that custody of a prisoner was the sole responsibility of the arresting officer. However, in response to Van Auken's order, Harris released Gamble from custody
 
 
 [3]
 The City maintains that this was done explicitly in contradiction to Van Auken's orders not to further pursue the matter pending the investigation by the Internal Affairs Division
 
 
 [4]
 The termination letter stated that Harris violated Rule 5 of the police department's rules and regulations for disobedience of order and Rule 3A for abuse of position
 
 
 [5]
 There is no serious debate that Harris performed his job in a competent manner during the approximately four and one-half years before the events in question
 
 
 [6]
 These other officials include: James Spore, the City Manager; Fagan Stackhouse, the Director of Human Resources; Police Chief Wall; Major McCloud; Captain Baker; and, Leslie L. Lilley, City Attorney
 
 
 [7]
 The dissent essentially takes the position that today's opinion moves away from Fourth Circuit precedent concerning Connick and Pickering and stresses "context" to the exclusion of "content." However, it is the dissent that fails to interpret correctly the relevant trend in Fourth Circuit case law and the principles laid out in Connick and Pickering. Specifically the dissent completely fails to mention either the important analysis contained in DiMeglio or the holdings stressing the significant role that context plays in combination with content and form. See, e.g., Dennison v. County of Frederick, 921 F.2d 50, 54 (4th Cir.1990) ("Although [plaintiff's] allegations appear to be of public interest, when they are considered in the context of what actually occurred ... they are 'more properly viewed as essentially a "private" matter between employer and employee.' " (quoting Berger v. Battaglia, 779 F.2d 992, 999 (4th Cir.1985), cert. denied, 476 U.S. 1159 (1986))), cert. denied, 501 U.S. 1218 (1991). This is not simply a look at the "subjective" intent of Harris, as the dissent would believe; on the contrary, it is an analysis of all the surrounding circumstances that play a role in determining what speech made by a public employee receives First Amendment protection. Thus, while content plays an important role, it by no means plays the only role in our determination
 The dissent, on the other hand, focuses almost exclusively on content without adequately taking into account surrounding circumstances. Thus, the dissent is left with the position that, as a matter of law, "employees who expose corruption and illegality enjoy the protection of the First Amendment, regardless of motivation." Aside from the virtual absence of evidence in the record indicating that Harris was "exposing" any corruption whatsoever, the dissent crafts a rule of law that essentially eviscerates the more careful balancing laid out in Connick-Pickering and dictates that any allegations of corruption made by a public officer will survive summary judgment scrutiny.
 In short, while we agree with the dissent that "[f]ew matters merit greater public concern than allegations of corruption, dishonesty, and illegality within the ranks of law enforcement," we will not blind ourselves to the surrounding circumstances to grant all allegations of corruption First Amendment protection.
 
 
 [8]
 Harris also argues that the district court erred in ruling that the defendants were entitled to qualified immunity in their individual capacities on the Sec. 1983 claim. While the preference of this Circuit is to address the issue of qualified immunity prior to the merits, DiMeglio, 45 F.3d at 794-95, we must reach the merits of the First Amendment claim in this case because the City itself is a party. Since we have determined that the Sec. 1983 claim against the City fails on the merits, we need not review the district court's ruling on qualified immunity against the individual defendants
 Harris further asserts that the district court erred in denying his motion to amend his complaint to include additional defendants. We also need not reach this issue. Harris does not include a copy of the motion, and argues in his brief only that the district court erred in denying the motion because the court erroneously concluded that the additional defendants were entitled to qualified immunity. Because Harris's argument only focuses on qualified immunity and he fails to include a copy of the motion in the joint appendix, we cannot do otherwise but presume that the motion presumably was only to add defendants to the Sec. 1983 claim, and not the state law claim. Accordingly, for the same reasons as above, we do not review the district court's denial of Harris's motion to amend.
 
 
 [9]
 Because we remand the state law claim for further proceedings given the failing of the Sec. 1983 action, we need not address various arguments put forward by Harris and the City as to damages awarded relating to the state law claim. These issues may well become moot based upon the district court's rulings on remand